**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TEOFILO VASCO** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | **NO.  15-4623** |
| **POWER HOME REMODELING** | : | |
| **GROUP LLC** | : | |

**<u>MEMORANDUM</u>**

**KEARNEY, J.**                                                    **October 12, 2016**

A class action of over 1.1 million persons challenging automated repeated sales calls to their cell phones from a sales-lead company must overcome significant legal issues after the persons possibly signed consents disclosing their cell phone numbers.  Class actions for over 1.1 million recipients of cell phone calls require the parties' careful investigation and analysis of the consent and likelihood of potential recovery against regional sales-lead companies with limited assets.  Recognizing the risks, the parties prudently agreed to a two-day mediation session conducted by an experienced mediator balancing these concerns and allowing the parties to fairly value their claims and defenses.  Counseled by experienced class action counsel, the parties agreed through the mediator to a settlement confirming both prospective "change in conduct" relief and a claims process for certain damages.  Over 101,000 persons, or approximately 9% of the Class, filed claims responsive to the Class Notice.

In the accompanying Orders, we approve the negotiated settlement as fair, reasonable and adequate after finding immediate changes in the sales-lead company's business practices on cell phone sales calls and an opportunity to file a claim to recover damages.  We further award 25% of the common fund recovery as attorney's fees, and approve the capped administrative costs

incurred by the Claims Administrator and Class Counsel.  We independently find the $5,000 incentive service fee for the Plaintiff is too high and reduce the incentive fee to $3,000 recognizing his service to the Class in beginning and then assisting in prosecuting his case although he never appeared for a deposition, mediation or a court proceeding.

## I.     Background[1]

While at a Home Depot, Teofilo Vasco gave his cell phone number to a salesperson.  He claims Power Home Remodeling Group LLC ("Power Home") then made twenty-one unsolicited calls to him seeking his business.  After independent research, he thought these calls may violate the Telephone Consumer Protection Act of 1991 ("Act")[2] and called a lawyer.  After investigation, he filed suit under the Act for himself and other persons receiving an auto-dialer or pre-recorded voice message on their cell phones.[3]   As described in his detailed Complaint included in our approved Class website described in the Class Notice, Vasco sought statutory damages of $500 per violation, costs, attorneys' fees, and treble damages for willful or knowing violations.[4]   Power Home vigorously asserted affirmative defenses of consent, statute of limitations, lack of intent to violate the Act, failure to state a claim upon which relief can be granted, and the unavailability of statutory attorneys' fees under the Act.[5]   Power Home produced a requested sampling of records evidencing approximately 20% of call recipients signed a consent for a call to their cell phone.  Vasco learned of over 1.1 million potential Class Members through informal discovery.  As a result of the litigation, Power Home modified its business practices on consent and cell phone calls.

In December 2015, the parties agreed to mediate before retired United States Magistrate Judge Diane M. Welsh.[6]  After engaging in informal document discovery, the parties held day-long mediations with Judge Welsh on February 17, 2016 and March 29, 2016.[7]  The parties

ultimately agreed in principle to settle the case.[8]  As part of the Settlement Agreement, Power Home agreed to pay a non-reversionary cash settlement of $5.2 million, which includes $1.3 million in attorneys' fees, up to $20,000 in litigation expenses, up to $5,000 for Vasco's service award and up to $1.2 million in notice and administrative costs.[9]

On May 5, 2016, Vasco filed an unopposed motion for preliminary approval of the settlement.[10]  Following a hearing, we granted the motion including requiring the posting of the Complaint and additional papers on a settlement website.[11]  On July 12, 2016, the Claims Administrator mailed our approved Class Notice to approximately 1,104,162 class members.[12]  As of September 23, 2016, the Claims Administrator received approximately 101,188 claim forms, a return rate of approximately 9%.[13]  Approximately one half of these claims arrived through the claim form on the settlement website.   As of our Final Fairness Hearing, the parties agreed to cap the anticipated administrative costs at $1,180,000.

On August 23, 2016, Vasco filed an unopposed motion for final approval of settlement along with a motion for attorneys' fees and expenses.[14]  Approximately 155 persons opted out of the Settlement.  Four persons filed objections.  On September 29, 2016, Vasco and Power Home filed responses to the four objectors.[15]  Two of the four objectors opted out of the settlement and lacked standing.   At our Final Fairness Hearing, four Class Members appeared but the two objectors (one of whom works as a paralegal in his lawyer's small law firm) did not.   The objectors' lawyer asked, at the last minute, if he could call into the hearing and we permitted him to argue objections from his phone.   We heard extensive argument and evaluated counsels' answers to our questions. We heard from one class member concerned about post-Class Period calls, and we described to him the Class Period and his potential remaining claims.

## I.     The Parties satisfy the Rule 23 class action requirements.

In reviewing a motion for class certification, we act as a fiduciary for absent class members and protect the interests of the federal judicial system.[16]   We may certify a class for settlement purposes as long as we find the Settlement Class satisfies the requirements under Federal Rule of Civil Procedure 23.[17]   Under Rule 23(a), Vasco may sue as representative of the class if he demonstrates: (1) the class is sufficiently numerous; (2) there are questions of law or fact common to the class; (3) Vasco's claims or defenses are typical of the claims or defenses of the class; and (4) Vasco will fairly and adequately protect the interests of the class.[18]   We must "assess all of the relevant evidence admitted at the class certification stage."[19]

The proposed Settlement Class consists of all persons who received a call made by or on behalf of Power Home on his or her cellular telephone where the call was made using an automatic telephone dialing system and/or pre-recorded or artificial voice messages during the period from October 16, 2013 to April 27, 2016.[20]   To the extent Power Home has made calls after this date, those recipients are not releasing claims.

The Class is sufficiently numerous. Classes in excess of forty members may satisfy the numerosity requirement.[21]   The Class consists of over 1.1 million persons.[22]

Commonality is satisfied.   Commonality is demonstrated where the plaintiff "share[s] at least one question of fact or law with the grievances of the prospective class."[23]   Numerous common issues of fact and law exist, including: a) whether Power Home's conduct in calling the Class Members violated the Act; b) whether Power Home had proper consent from the recipients of the calls; c) whether Power Home's calls originated from an automated telephone dialing system; and d) whether Power Home's violations were knowing or willful.

Typicality is also satisfied. "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims."[24] Vasco demonstrates typicality because he shows Power Home engaged in the same conduct toward him and the Class Members, which caused the same injury to both him and the Class Members.

Vasco fairly and adequately represents the Class. In assessing this requirement, we must consider whether: a) Vasco "has the ability and incentive to represent the claims of the class vigorously;" b) Vasco "has obtained adequate counsel;" c) "there is [a] conflict between [Vasco's] claims and those asserted on behalf of the class;" and finally, d) Vasco "has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel."[25] As to the first factor, Vasco participated directly in many phases of this litigation.[26] He started this process and found a lawyer. He then assisted his counsel in preparing the Complaint and provided documents with the dates and number of calls he received from Power Home.[27] He also consulted with counsel before, during, and after the mediation sessions.[28] Vasco demonstrated his ability and incentive to represent the Class claims. As to the second factor, Vasco's choice of counsel is adequate, as demonstrated by Class Counsels' vast and well-known experience litigating class action claims.[29] As to the third factor, we find no conflict between Vasco's claims and the Class claims. Vasco has shown a willingness to negotiate a reasonable retainer, as he agreed to the propriety of his counsels' 25% contingency fee.[30]

In addition, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)."[31] Under Rule 23(b)(3), Vasco must demonstrate: (1) questions of law or fact common to class members predominate over questions affecting only individual members, and

(2) class resolution is superior to other methods.[32]   We may certify a class only if we are "satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."[33]

Vasco satisfies the predominance requirement. "Predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"[34]   The predominance inquiry derives from the Rule 23(a) commonality requirement, but is more demanding.[35]   "[T]he predominance inquiry focuses a common course of conduct by which the defendant may have injured class members."[36]   We are "more inclined to find the predominance test met in the settlement context."[37]   Vasco demonstrates predominance, as he alleges Power Home engaged in a common course of conduct by making unsolicited telemarketing calls to the Class Members.

Vasco satisfies the superiority requirement.  For superiority, we "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication."[38]   As sought in the Complaint—which the parties posted on the settlement website—the Act permits statutory damages of $500 for each violation (i.e. phone call) and treble damages for knowing or willful violations.  Each Class Member may potentially have claims for thousands of dollars.  Given this suit involves over 1.1 million members, individual lawsuits from the Class Members could easily lead to over $500 million in claims against Power Home. Power Home's limited insurance would pay for the litigation costs and leave much less for the claimants in many lawsuits.  Power Home is a regional "middle-man" which calls homeowners regarding home renovation projects and, if the homeowner is interested, Power Home arranges for an independent contractor to perform the service.  Power Home has no significant hard assets although it employs many persons to make these phone contacts and follow-up.  As Vasco recognized, Power Home could be judgment proof on an eventual

judgment here, or in many individual cases, for the full statutory amount on a class basis.  As discussed during the Final Fairness Hearing, a judgment may likely result in a business bankruptcy and possible discharge of any eventual judgment.  Counsel also represented Power Home has not funded the $5.2 million Settlement amount.  We expressed concern with the potential the Settlement Amount may not be available shortly after a final order but the parties have agreed to proceed now rather than assume a risk of no recovery from multiple suits years from now.  In this context, Class resolution increases the likelihood all Class Members can obtain relief in a cost effective manner.  Vasco satisfies the superiority requirement.

## II.    The proposed Settlement is fair, reasonable and adequate.

Under Rule 23(e)(2), we cannot approve a class action settlement unless it is "fair, reasonable and adequate."[39]  There is a "strong presumption in favor of voluntary settlement agreements" in the class action context.[40]  "This presumption is especially strong in 'class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.'"[41]  This "strong judicial policy . . . contemplates a circumscribed role for the district courts in settlement review and approval proceedings."[42]

The Settlement Agreement is entitled to a presumption of fairness.  "We apply an initial presumption of fairness in reviewing a class settlement when: '(1) the negotiations occurred at arms-length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'"[43]  The parties negotiated the Settlement Agreement at arm's length with the benefit of a neutral, experienced mediator, Judge Welsh.[44]  Prior to the mediation sessions, the parties conducted informal discovery, including over one million pages of documents Power Home claimed constituted consent to receive calls from Power Home.[45]  Vasco's counsel, W. Craft Hughes, is

experienced in class action litigation under the Act, as is Power Home's *pro hac vice* counsel, David M. Schultz.[46]   There are only four objectors, which constitutes an infinitesimally small fraction of the entire class.   We must apply the presumption of fairness to the Settlement Agreement.

### a. The *Girsh* factors weigh in favor of settlement.

Our Court of Appeals in *Girsh* identified nine factors to consider when determining the fairness of a proposed settlement.[47]   "The settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement."[48]

### i. The complexity, expense and likely duration of the litigation.

This factor "captures the probable costs, in both time and money, of continued litigation."[49]   Vasco states discovery of Power Home's dialing system would require each party to hire technical experts at significant cost.[50]   As the parties did not complete formal discovery, they would bear the normal yet significant expenses associated with prosecuting a contested motion to certify a class, reviewing documents, taking depositions, opposing an anticipated motion for summary judgment, trying a case before a jury, and potentially litigating the case on appeal.   The primary issue in this case is whether Power Home had the Class Members' express consent, which is not a particularly complex issue.   As Vasco states in his brief, "Defendant would either have or lack the written consents required by the [Act] for those calls."[51]   This factor weighs in favor of settlement, but not heavily because of the lack of complexity.

### ii. The Class reaction to the settlement.

This factor "attempts to gauge whether members of the class support the settlement."[52]   Courts reviewing this factor observe the percentage of objectors and opt-outs.[53]   For example, our court of appeals found objection and opt-out rates of 1%, respectively, weighed in favor of

settlement.[54]   As of September 23, 2016, 155 of the more than 1.1 million noticed Class Members timely excluded themselves from the Class.[55]   There are four total objectors, and two of which have already opted out of the class.  As the opt-outs and objectors account for less than 1% of Class Members, this factor weighs in favor of settlement.

### iii. The stage of the proceedings and the amount of discovery completed.

This factor "captures the degree of case development that class counsel [had] accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."[56]  The parties engaged in informal discovery in preparation for mediation early in the case.  Power Home produced over one million pages of documents: calling scripts; documents addressing whether Power Home used an automated telephone dialing system; documents concerning Vasco; documents concerning calls made to Class Members' cell phones; and documents concerning insurance coverage.[57]

Vasco's counsel states he conducted an in-depth analysis of "key legal and factual issues" in preparing for mediation: a) whether Power Home's "consent" documents constituted consent under the Act; b) whether Power Home used an automatic telephone dialing system; c) the existence of standing; d) the typical range of settlements in similar class actions; e) whether Power Home's methods of gathering telephone numbers constituted a defense to class certification; and f) the availability of exceptions to class certification.[58]  Vasco's counsel also states he conducted many interviews with former Power Home employees, Power Home's subcontractors, and persons contacted by Power Home.[59]  Based on these representations, we are confident counsel had an adequate appreciation of the merits of the case before negotiating settlement.

#### iv.   The risks of establishing liability and damages.

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement."[60]  We "need not delve into the intricacies of the merits of each side's arguments, but rather may 'give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'"[61]  Vasco's counsel states the Class has much to gain in avoiding continued litigation because Power Home would assert: a) the existence of consent; b) differences in the method of obtaining consent preclude class certification; c) Class Members lack standing; d) the calls did not originate from an automated telephone dialing system; and e) the regulation requiring express written consent before contacting potential customers is an invalid expansion of the Act.[62]  These risks weigh in favor of settlement.

#### v.   The risks of maintaining the class action through the trial.

"[T]his factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial."[63]  "In a settlement class, this factor becomes essentially 'toothless' because 'a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.'"[64] As the Settlement Agreement forecloses trial, this factor weighs in favor of settlement.

#### vi.   Defendant's ability to withstand a greater judgment.

This "factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement."[65]  This "factor is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement."[66]  Each Act violation

(i.e. phone call) yields $500 in statutory damages, and treble damages for willful and knowing violations.  Given the existence of 1.1 million Class Members, damages could easily exceed $500 million.  At the Final Approval Hearing, Vasco explained a judgment in his favor for the full amount of relief sought may bankrupt Power Home because it is a private regional home improvement sales-lead company with no significant hard assets and limited insurance coverage. A judgment may likely result in a business bankruptcy and discharge of the claims or eventual judgments.  This factor weighs in favor of settlement.

### vii.   The range of reasonableness of the settlement fund in light of the best possible recovery and all the attendant risks of litigation.

In reviewing the final two factors, we ask "whether the settlement represents a good value for a weak case or a poor value for a strong case."[67]  "The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial."[68]  "[T]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement."[69]  Vasco estimates the possible range of damages from $550 million to $1.65 billion on the assumption of only one Act violation per Class Member.[70]  The Settlement Amount is $5.2 million.  Given Vasco's representations as to Power Home's defenses to certification and on the merits, we find the Settlement reasonable in light of the case's strengths and weaknesses.  All Class Members had the opportunity to opt out of the settlement and preserve their right to independently seek full recovery of their alleged damages if they believed they could achieve better results.  Less than 10% of the over 1.1 million Class Members did so.

### b. *Prudential* considerations

Our Court of Appeals elaborated on the *Girsh* factors, identifying several permissive, non-exhaustive factors:

> [1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.[71]

As to the first factor, the parties engaged in substantial informal document discovery. One of the controlling issues is whether Power Home had requisite consent to conduct its phone calls. Vasco contends the applicable regulations require prior "written" consent, while Power Home claims the statute only requires prior "express" consent.[72] The applicable regulation requires, in pertinent part, "[a]n agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver . . . to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice."[73] The existence of this explored yet unresolved dispute weighs in favor of settlement.

While the second factor is not relevant, the third factor weighs in favor of settlement. Class Members stand to gain approximately $27 each as a result of the settlement. This represents a small fraction of what each Class Member would otherwise be entitled to in statutory damages. Each unsolicited phone call may result in $500 in statutory damages and

treble damages for willful or knowing violations.  Although these damages appear attractive, an individual action under the Act may not be financially feasible.  The costs of prosecuting an action, which includes the initial filing fee, could easily swallow a large portion of an individual claimant's recovery.  The Act does not permit recovery of attorneys' fees, which means an individual claimant would need to proceed *pro se*, pay by the hour, or pay under a contingency agreement.  These costs and fees necessarily reduce an individual claimant's amount of recovery, and could easily render an individual lawsuit cost ineffective. This factor weighs in favor of settlement.

The fourth factor weighs in favor of settlement because Class Members were given an opportunity to opt out.  We address the remaining factors during our review of the objections to the reasonableness of the 25% attorney fee, the administrative costs, and the procedure for opting out.  All of these factors weigh in favor of settlement.

### c. *Baby Products* considerations

In *Baby Products*, our Court of Appeals added factors to consider when reviewing a class action settlement:

> We add today that one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class.  In making this determination, a district court may consider, among other things, [1] the number of individual awards compared to both the number of claims and the estimated number of class members, [2] the size of the individual awards compared to claimants' estimated damages, and [3] the claims process used to determine individual awards. . . . Making these findings may also require a court to withhold final approval of a settlement until the actual distribution of funds can be estimated with reasonable accuracy.  Alternatively, a court may urge the parties to implement a settlement structure that attempts to maintain an appropriate balance between payments to the class and *cy pres* awards.  For instance, it could condition approval of a settlement on the inclusion of a mechanism for additional payouts to individual class

members if the number of claimants turns out to be insufficient to deplete a significant portion of the total settlement fund.[74]

The first consideration is not relevant to this case. The number of individual awards is the same as the number of claims because a Class Member who submitted a claim receives an individual award.

As to the second consideration, the size of the individual award is fair. The Claims Administrator represented, "[i]f all of the Claim Forms submitted are valid and non-duplicate, and the Court awards the fees and costs reflected [] in the Settlement Agreement, each Class Member will receive a distribution of approximately $26.63."[75] Class Counsel updated this amount at our Final Fairness Hearing as slightly higher than $27.00. This amount is consistent with other class action settlements under the Act.[76]

As to the third consideration, all Class Members receive the same award regardless of the number of Act violations.[77] Given the administrative and practical difficulties Claim Members may face in proving multiple violations, this claim process is fair.

The *cy pres* provision does not render the Settlement unfair. *Cy pres* funds will consist of unused administrative costs and uncashed checks. We cannot readily estimate this amount, but the Claims Administrator estimates its additional administrative costs amount to no more than $204,959.42.[78] Assuming this amount constituted the unused costs and uncashed checks and were distributed to the 101,188 Class Members that submitted Claims Forms,[79] each Class Member would receive approximately an additional $2.00. This distribution is not worth the expense. *Cy pres* is appropriate here given the administrative costs of distributing the *de minimis* unused portion of the Settlement Fund.

### III.     We overrule the objections to the Settlement.

We heard from four objectors.  Two of the objectors, Valerie L Morrison and Steve Wimmer, opted out of the Settlement,[80] and thus lack standing to object.[81]   The remaining objectors are Frank Caligiuri and Erin Caligiuri (the "Caligiuris").  Frank Caligiuri is a paralegal who hired his employer, solo practitioner Attorney Vullings, to represent his wife and him.  Neither counsel nor the Caligiuris appeared at the Final Fairness Hearing but Attorney Vullings asked, at the last minute, for our indulgence to allow him to argue through the phone.

### a.  Notice

The Caligiuris contend the attorney fee motion should have been posted to the Settlement website.[82]  They claim it is "unreasonable" to expect them to purchase the motion on PACER or reach out to Class Counsel for a copy.[83]   The Notice, however, notified Class Members of the request for attorneys' fees of up to 25% of the Settlement Amount.[84]  Vasco filed the attorneys' fees motion on August 23, 2016,[85] making it publicly available twenty-two days before the deadline to object.  The Caligiuris do not cite authority requiring posting of a fee motion on a website, and we find none.[86]  This objection is overruled.

The Caligiuris express concern over the adequacy of the notice program.[87]  For example, "there is no indication as to how many valid mailing addresses the Claims Administrator has" or whether "the Administrator is performing a change of address search for other class members in [Power Home's] records."[88]  The Caligiuris also complain of the lack of "explanation as to what steps the Claims administrator will take if mailed notice is returned undeliverable."[89]  These concerns are no longer valid because the Claims Administrator provided information as to the notice program.  He forwarded Notices returned as undeliverable to the updated addresses provided by the United States Postal Service.[90]  We overrule these objections.

15

While not included in his paralegal's/client's written Objections, Attorney Vullings orally challenged the Class Notice for failing to advise the Class of the maximum statutory recovery under the Act.  His argument is admittedly derived from his personal experience as a lawyer representing class members in Act cases where he personally believes the maximum statutory recovery should be specifically described in the Notice.  His paralegal/client did not raise this Objection and for this reason alone, we could overrule a lawyer's last minute challenge as violating the Class Notice.  Notwithstanding the impropriety of raising a new objection at the Fairness Hearing, we also find his objection lacks substantive merit.  Attorney Vullings admits he has no authority supporting his anecdotal observation.  He also admits not knowing whether this disclosure would have increased the 9% claim rate.  Even if he did, the Notice specifically represented the settlement website which, upon our Order, included the Complaint.  The Complaint specifically alleges the damages available to each claimant under the Act.   Attorney Vullings may be previewing a legislative initiative but we will not add this requirement to Class Notices under the Act when the settlement website describes the extent of available recovery.

### b. *Cy Pres* **funds**

The Caligiuris' objection to the allocation of *cy pres* funds is meritless.  The Caligiuris incorrectly claim there is a conflict of interest, as the leftover settlement proceeds will be distributed to Philadelphia-based organizations which could refer cases to Class Counsel.[91]  In reality, the Settlement Agreement, as superseded by the May 13, 2016 Preliminary Approval Order, permits *cy pres* distribution to organizations not directly serving Philadelphia County: Legal Aid of Southeastern Pennsylvania and the national headquarters for Habitat for Humanity.[92]  The Caligiuris submit no evidence on these phantom referrals.  To the extent Legal Aid of Southeastern Pennsylvania may hypothetically or potentially refer cases to Class Counsel

based on the *cy pres* distribution, this speculative claim does not render the settlement unfair.  *Cy pres* funds are distributed after the distribution of settlement proceeds, and likely will be *de minimis*, resulting from uncashed checks and unused administrative costs.  We find no conflict of interest rendering the settlement unfair.

### c.   Settlement amount

The Caligiuris object to the Settlement Amount as inadequate.  The anticipated award per claimant is approximately $26.63[93] and may exceed $27.00.  We concluded this recovery is fair given the case's strengths and weaknesses.  We concluded this recovery is consistent with other class action settlements under the Act.[94]  Although the Act permits $500 per violation, the anticipated amount is fair, as "a 'satisfactory settlement' may only 'amount to a hundredth or even a thousandth part of a single percent of the potential recovery.'"[95]  We overrule this objection.

### d.   Release

The Caligiuris claim the Settlement does not prospectively deter Power Home from further violating the Act.  The Settlement Agreement does not specifically prohibit Power Home from engaging in similar conduct in the future.  As shown in our May 13, 2016 Order, Power Home's modified "its business practices regarding how it obtains consent."[96]  Additionally, the Settlement Agreement only compensates for and releases Act violations occurring during the Class Period.[97]  The Class Members retain the right to sue for future violations.  We find the "best assurance against future" violations "is the persistent threat of litigation by any class member."[98]  Injunctive relief is unnecessary.  We overrule this objection.

The Caligiuris also object to the Settlement Agreement's release of claims, claiming it releases all claims under any theory "relating to or arising from matters that occurred from the

17

beginning of time."[99]   This objection lacks merit because the quoted language only applies to

Vasco.[100]   In contrast, the Class Members release only Act claims and similar state law claims

arising during the October 16, 2013 to April 27, 2016 Class Period.   Under its terms, "[t]he

Settlement is intended by the Parties to fully and finally compromise, resolve, release, discharge,

and settle the Released Claims (as defined below) as against all Released Parties (as defined

below)."[101]   "Released Claims" is defined as:

> [A]ny and all claims, liens, demands, actions, causes of action,
> obligations, damages or liabilities of any nature whatsoever that
> arose during the time period from October 16, 2013 to April 27,
> 2016, whether legal or equitable or otherwise, that actually were,
> or could have been, asserted in this Action based upon the facts
> alleged in the Action that arise from any violation of any provision
> of the TCP A or any similar state statute, and any claim arising
> directly or indirectly out of, or in any way relating to, the claims
> that actually were, or could have been, asserted in the Action.[102]

The parties define "Released Parties" as Power Home, its parents, subsidiaries, divisions,

affiliates, predecessors, successors, assigns, partners, members, directors, officers, managers,

employees, agents, licensees, agencies, attorneys, insurers, accountants and representatives.[103]

Such a release is consistent with the principles of *res judicata* because it only releases claims

arising from the same nucleus of facts against the same defendant or its privies.[104]   "The weight

of authority establishes . . .  a court may release not only those claims alleged in the complaint

and before the court, but also claims which 'could have been alleged by reason of or in

connection with any matter or fact set forth or referred to in' the complaint."[105]   We overrule this

objection.

The Caligiuris claim "[i]t is unfair to the Class that less than 1 out of 10 Class Members

will receive payment in exchange for a full release of all claims."[106]   This argument is meritless

because the Settlement Agreement gave every Class Member an opportunity to opt out of the

class.  "Since the plaintiff is offered the opportunity to opt out of the class simultaneously with the opportunity to accept or reject the settlement offer . . . the plaintiff knows exactly what result he or she sacrifices when opting out."[107]

### e.  Administrative costs

The Caligiuris argue the administrative charges of approximately 23% of the Settlement Fund are excessive.  The parties represented a thorough review of invoices and we reviewed the affidavit of efforts from the approved Claims Administrator.  We have no evidentiary basis to question these representations.  The Caligiuris offer no support for their objection, and we find none.

The Claims Administrator represents the administrative costs and fees as of August 31, 2016 are $975,040.58.[108]  It estimates additional administrative costs of no more than $204,959.42,[109] placing the total possible administrative costs at $1,180,000.  There are approximately 1.1 million Class Members, making the cost per Class Member about $1.00.  The Objectors do not provide evidence these costs are unreasonable.  As this amount appears to be reasonable and we have no contrary evidence, we overrule this objection.

### f.  Process for exclusion

The Caligiuris also contend the process for exclusion from the Class—mailing a form to the Claims Administrator—is unfairly burdensome.  They fail to support this contention with citations and we find mailing is appropriate.  We overrule this objection.

### IV.    We grant Class Counsel's motion for attorney's fees.

Class Counsel's requested attorney's fee of 25% of the common fund is fair and reasonable. "In a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement."[110]  "[A] thorough

judicial review of fee applications is required in all class action settlements."[111]  "This is so even where the parties have consented to the proposed attorney's fees . . . because of the risk that the 'lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for re-carpet treatment for fees.'"[112]  "Because of the intrinsic conflict of interest between the attorneys for a Rule 23(b)(3) class and the class members when attorneys' fees are a deduction from the fund created for the benefit of the class, fee requests from a fund in court must be subjected to heightened judicial scrutiny."[113]  "The District Court has a positive and affirmative function in the fee fixing process, not merely a passive role."[114]

"The percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'"[115]  "The lodestar method is more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation."[116]

Vasco requests $1.3 million in attorneys' fees, which constitutes 25% of the Settlement Amount. In determining the propriety of a reasonable percentage fee award, we must consider and balance factors provided by our Court of Appeals in *Gunter* and *Prudential*.[117]

### a.  The size of the fund created and the number of beneficiaries.

The size of the Settlement Fund is $5.2 million. As of September 23, 2016, the Claims Administrator received approximately 101,188 claims from more than 1.1 million putative plaintiffs.[118] This represents a claims rate of approximately 9%, which is higher than rates found permissible in other class settlements under the Act.[119]

"In general, as the size of the settlement fund increases, the percentage of the award decreases."[120] Settlement funds exceeding $100 million typically require an automatic reduction in the percentage award.[121] The Settlement Fund is not exceedingly high to warrant an automatic reduction. This factor supports the proposed fee.

### b. The presence or absence of substantial objections by members of the Class to the settlement terms and/or fees requested by counsel.

Only two objectors have standing. Two out of 1.1 million constitutes a very small fraction of the Class.  The Caligiuris contend the fee is unreasonable because it is calculated from the Net Settlement Amount before the deduction of administrative costs. They do not provide support for this argument, and we find none.

Some courts have held the fee award should be based on the net settlement amount after deducting *litigation* costs.  For example, in *Lanchance v. Harrington*, Judge Yohn reasoned such a deduction incentivizes counsel to minimize litigation costs.[122]  Alternatively, in *In re Intelligent Electronics, Inc. Securities Litigation*, Judge Vanartsdalen reasoned such a deduction may disincentivize counsel from making a thorough investigation of the case before agreeing to a settlement, potentially resulting in less favorable terms for the class.[123]  The Settlement Agreement in this case restricts the total amount of recoverable litigation expenses to an amount not exceeding $20,000.[124]  This term adequately incentivizes counsel to minimize litigation costs. We overrule this objection.

We decline the Caligiuris' invitation to award fees on a lodestar basis.  The Caligiuris ask us to use the lodestar analysis, as the Court of Appeals for the Seventh Circuit found permissible in *Americana Art China Company, Inc. v. Foxfire Printing & Packaging, Inc.*[125]  In *Foxfire*, the court of appeals found no abuse of discretion in the district court's use of a lodestar to avoid overcompensating counsel.[126]  The court specifically held "it is legally correct for a district court

to choose either" the percentage-of-recovery or lodestar method.[127]  "[T]he choice of methods is discretionary."[128]  Alternatively, in our Circuit, the percentage-of-recovery method is "generally favored" in common fund cases.[129]  To the extent we have discretion to apply a lodestar basis in a common fund cases, we decline to do so here.  As the Caligiuris fail to raise substantial objections, this factor supports the proposed fee.

### c.   The skill and efficiency of the attorneys involved.

"The Third Circuit has explained that the goal of the percentage fee-award device is to ensure 'that competent counsel continue to undertake risky, complex, and novel litigation.'"[130] In evaluating the skill and efficiency of the attorneys involved, we consider "the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel."[131]

Vasco's counsel is experienced in class actions under the Act, as is Power Home's *pro hac vice* counsel, David M. Schultz.[132]  They quickly and efficiently agreed to mediate with an experienced mediator only five months after Power Home answered the Complaint.  They negotiated a non-reversionary $5.2 million settlement for a Class of more than 1.1 million individuals. This factor supports the proposed fee.

### d.   The complexity and duration of the litigation.

As addressed above in our discussion of the *Girsh* factors, this factor supports the proposed percentage.

### e.   The risk of nonpayment.

"In every class action in which class counsel bring a case on a contingency basis, there is some risk of nonpayment."[133]  Each Act violation (i.e. phone call) yields $500 in statutory

damages, and treble damages for willful and knowing violations.  Given the existence of over 1.1 million Class Members, damages could easily exceed $500 million.  Vasco argues a judgment in his favor for the full amount of relief sought may bankrupt Power Home, a private regional home improvement sales-lead company.[134]  We have no evidence as to Power Home's solvency but, as described above, counsel represented the nature of Power Home's "middle-man" sales-lead role with limited hard assets.  Counsel represented considering the bankruptcy risk with risk of discharge of an Act claim in a bankruptcy.  This factor weighs in favor of the requested fees.

### f.   The amount of time devoted to the case by Class Counsel.

As of August 16, 2016, Vasco's counsel expended a total of 1,137.7 hours of work on the case for over a year.[135]  Counsel engaged in informal discovery of over one million documents and participated in two mediation sessions.  The parties did not engage in motions practice. Class Counsel incurred hours relating to the Final Fairness Hearing, including deposing the Caliguiris, without seeking reimbursement.    Under the circumstances, these hours are reasonable. This factor supports the proposed fee.

### g.   Awards in similar cases.

The Settlement Amount is consistent with amounts awarded in class settlements in our Circuit.  For example, in *Tavares v. S-L Distribution Co.*, Judge Jones found the requested 25% award "typical" after reviewing the range of fee awards in cases involving a common fund.[136] Judge Schiller found a fee award of 30% "reasonable and in keeping with similar precedent."[137] This factor supports the proposed fee.

**h. The value of benefits attributable to the efforts of Class Counsel relative to the efforts of other groups, such as government agencies conducting investigations.**

The entire value achieved for the Class is attributable to Class Counsel after Vasco found them and moved forward. No other groups, such as government agencies conducting investigations, assisted. This factor supports the requested fee.

**i. The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained.**

"In private contingency fee cases, attorneys routinely negotiate agreements for between thirty percent (30%) and forty percent (40%) of the recovery."[138] The requested 25% fee is below this range, which supports the requested fee.

**j. Any innovative terms of settlement.**

"The terms of this settlement are relatively standard. In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request."[139]

**k. Lodestar cross-check confirms the fairness of the requested fee.**

Our Court of Appeals advises we, in common fund cases, "cross-check the percentage award counsel asks for against the lodestar method of awarding fees so as to insure that plaintiffs' lawyers are not receiving an excessive fee at their clients' expense."[140] "The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier."[141] "[W]hen the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award."[142] Lodestar multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."[143]

24

Vasco's counsels' lodestar as of August 16, 2016 is $696,409.00 for 1,137.7 hours of work.[144]   The resulting multiplier is 1.87, which is within the range frequently awarded in common fund cases.  As described at oral argument, we also expect Class Counsel's lodestar will increase, further reducing the multiplier.

## V.    Expenses

As of August 23, 2016, Vasco's counsel expended $22,576.38 on litigation expenses.[145] The Settlement Agreement restricts the total amount of recoverable litigation expenses to $20,000.[146]  Given the cap in the Settlement Agreement, counsel had an incentive to conserve expenses.  We find Vasco's request for up to $20,000 in expenses is reasonable.

## VI.    Incentive Award

Incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class."[147]  "In fact, '[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'"[148]  "Incentive awards also 'reward the public service' of contributing to the enforcement of mandatory laws."[149]

We may increase or decrease Vasco's incentive award based on his contributions to the case.[150]  For example, Judge Pollak found $5,000 reasonable where the named plaintiff obtained counsel, documented and maintained records, made his home available for inspection, and appeared for a deposition.[151]  Similarly, Judge Walls found reasonable a range of fees based on each named plaintiff's participation: a) $5,000 for the lead named plaintiff for being "extremely active" in the case; b) $3,000 to two others for responding to discovery and making themselves available for depositions; and c) $1,000 to the remaining named plaintiffs for filing their claims in separate actions and agreeing to consolidate their claims into the final settlement.[152]

We may also reduce Vasco's incentive award if it constitutes an unreasonably large proportion of the total settlement.[153] For example, in *Staton v. Boeing Co.*, the Court of Appeals for the Ninth Circuit found unreasonable multiple incentive awards totaling $890,000, making up 6% of the total settlement and constituting 30 times the amount received by unnamed class members.[154]  In *In re Online DVD-Rental Antitrust Litigation*, the Court of Appeals for the Ninth Circuit found reasonable nine $5,000 incentive awards totaling $45,000, making up 0.17% of the total settlement.[155] Although the individual incentive awards were 417 times larger than the individual awards, the Court found more relevant the disproportionality of the incentive awards relative to the total settlement amount.[156] The court distinguished this case from *Staton*, explaining the "incentive awards make[] up a mere .17% of the total settlement fund . . . which is far less than the 6% of the settlement fund in *Staton* that went to incentive awards."[157] In a starker example, Judge Byron in *Palmer v. Dynamic Recovery Solutions, LLC* found unreasonable a $2,000 incentive award—representing 16% of the $12,000 total settlement fund—because the plaintiff's only contributions to the case related to preparing the complaint.[158]

Vasco requests $5,000 for his service in the case.  He started this case.  He found the lawyers and agreed to have his name on a national class action complaint.  He assisted in preparing the Complaint, answering discovery, making himself available at the mediation sessions before Judge Welsh.  He did not appear before Judge Welsh or at the Final Approval Hearing.[159]  Nor did he undergo a deposition.  Vasco is entitled to an incentive award, but only an amount commensurate with his contributions to the case and not disproportionate to the total settlement.  Balancing his efforts to begin this case with an incentive service award, we reduce his incentive fee to $3,000.

The Caligiuris object to Vasco's $5000 incentive award as unreasonable "because Plaintiff had individual claims."[160]   We need only make an obvious observation: the named plaintiff in a class action suit must have a claim.   The Caligiuris also contend Vasco lacks standing "because he has not demonstrated any injury from Defendant's conduct."[161]   The Caligiuris do not specify the type of standing lacking: statutory, constitutional, and prudential. Our Court of Appeals has instructed receiving automated calls violates a privacy interest, and thus adequately demonstrates an injury-in-fact for the purposes of Article III standing.[162]   In *Stoops v. Wells Fargo Bank, N.A*, Judge Gibson held the defendant's calls did not violate the plaintiff's privacy interest because the plaintiff "admitted that her only purpose in using her cell phones is to file [Act] lawsuits."[163]   Vasco, however, adequately demonstrates Power Home's twenty-one calls to him affected his privacy rights.   He alleges Power Home usually called him during work hours, which "distracted and annoyed" him.[164]

### VII.   Conclusion

In the accompanying Orders, we grant Vasco's motion for final approval of the settlement and motion for attorneys' fees and expenses, while reducing the incentive fee to $3,000.

The Settlement is fair, reasonable, and adequate.   The Class satisfies all of the requirements under Federal Rules of Civil Procedure 23(a) and (b)(3). The Settlement Agreement is entitled to the presumption of fairness, in part because the parties negotiated it at arm's length with the benefit of an experienced mediator over two days. The fairness considerations weigh in favor of settlement.   We overrule the limited objections from two of the over 1.1 million Class Members who bring, among other things, a challenge to our approved Class Notice referencing the Complaint but not specifically describing the maximum requested

recovery under the statute and an entirely unsupported challenge to administrative charges, legal

fees, and the incentive award.

---

[1] Unless otherwise defined, all capitalized terms in this Memorandum have the same meaning as in the May 5, 2016 Settlement Agreement (ECF Doc. No. 23-1.)

[2] 47 U.S.C. § 227.

[3] ECF Doc. No. 1, at ¶ 1.

[4] *Id.* at ¶ 3.

[5] ECF Doc. No. 10, at 11.

[6] ECF Doc. No. 28, at ¶ 9.

[7] *Id.* at ¶ 18.

[8] *Id.*

[9] *Id.* at ¶ 23.

[10] ECF Doc. No. 23.

[11] ECF Doc No. 25.

[12] ECF Doc. No. 28-5, at ¶¶ 6–8.

[13] ECF Doc. No. 34-4, at ¶ 9.

[14] ECF Doc. Nos. 26–27.

[15] ECF Doc. Nos. 34–35.

[16] *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 5 F.3d 768, 784 (3d Cir. 1995).

[17] *Id.* at 778.

[18] Fed. R. Civ. P. 23(a).

[19] *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 779 (3d Cir. 2009) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 317, 323 (3d Cir. 2008) (internal quotations omitted)).

[20] ECF Doc. No. 23-1, at ¶ 1.6.

[21] *Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001).

[22] ECF Doc. No. 28-5, at ¶¶ 6–8.

[23] *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

[24] *Barel v. Bank of Am.*, 255 F.R.D. 393, 398 (E.D. Pa. 2009) (quoting *Stewart*, 275 F.3d at 227).

[25] *Rabin v. John Doe Mkt. Makers*, No. 15-551, 2015 WL 3755298, at *4 (E.D. Pa. June 16, 2015) (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 265–66 (3d Cir. 2001)).

[26] ECF Doc. No. 28-3, at ¶ 3.

[27] *Id.*

[28] *Id.*

[29] ECF Doc. No. 28, at ¶¶ 2–4.

[30] ECF Doc. No. 28-3, at ¶ 5.

[31] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

[32] Fed. R. Civ. P. 23(b)(3).

[33] *Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir. 2006) (quoting *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (internal quotations omitted)).

[34] *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 434 (3d Cir. 2016) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

[35] *Id.*

[36] *Barel*, 255 F.R.D. at 399.

[37] *In re Nat'l Football League*, 821 F.3d at 434 (quoting *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 304 n.29 (3d Cir. 2011) (en banc)).

[38] *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998).

[39] *Id.*

[40] *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010).

[41] *Id.* at 595 (quoting *In re Gen. Motors*, 55 F.3d at 784).

[42] *Id.*

[43] *In re Nat'l Football League*, 821 F.3d at 436 (quoting *Cendant*, 264 F.3d at 232 n.18).

[44] ECF Doc. No. 28, at ¶¶18–19.

[45] (*Id.*)

[46] We take judicial notice of the Act class action lawsuits where counsel served as attorneys of record.

[47] *In re Nat'l Football League*, 821 F.3d at 437 (quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).

[48] *Id.* (quoting *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010)).

[49] *Id.* at 437 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535–36 (3d Cir. 2004)).

[50] ECF Doc. No. 26-1, at pp. 18–19.

[51] *Id.* at p. 15.

[52] *In re Nat'l Football League*, 821 F.3d at 438 (quoting *Warfarin Sodium Antitrust Litig.*, 391 F.3d at 536.

[53] *See, e.g.*, *id.*

[54] *See id.*

[55] ECF Doc. No. 34-4, at p. 4.

[56] *In re Nat'l Football League*, 821 F.3d at 438–39.

[57] ECF Doc. No. 28, at ¶ 13.

[58] *Id.* at ¶ 15.

[59] *Id.*

[60] *In re Nat'l Football League*, 821 F.3d at 439 (quoting *Prudential*, 148 F.3d at 319).

[61] *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005) (quoting *Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997)).

[62] ECF Doc. No. 28, at ¶ 25.

[63] *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 537.

[64] *In re Nat'l Football League*, 821 F.3d at 440 (quoting *Prudential*, 148 F.3d at 321).

[65] *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 537–38.

[66] *In re Nat'l Football League*, 821 F.3d at 440.

[67] *Id.* (quoting *Warfarin*, 391 F.3d at 538).

[68] *Id.* (quoting *Warfarin*, 391 F.3d at 538).

[69] *Id.* (quoting *Prudential*, 148 F.3d at 322).

[70] ECF Doc. No. 26-1, at p.18 n.8.

[71] *Prudential*, 148 F.3d at 323.

[72] The parties clarified this dispute at the October 7, 2016 final approval hearing.

[73] 47 C.F.R. § 64.1200(f)(8).

[74] *In re Baby Products Antitrust Litigation*, 708 F.3d 163, 174 (3d Cir. 2013).

[75] ECF Doc. No. 34-4, at ¶ 14 (footnotes omitted).

[76] *See, e.g.*, *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 493 (N.D. Ill. 2015) ($30); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 790 (N.D. Ill. 2015) ($34.60); *Rose v. Bank of Am. Corp.*, No. 11-02390, 2014 WL 4273358, at *10 (N.D. Cal. Aug. 29, 2014) ($20 to $40).

[77] ECF Doc. No. 23-1, at ¶ 1.21.

[78] *Id.* at ¶ 13.

[79] *Id.* at ¶ 9.

[80] ECF Doc. No. 34-4.

[81] *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 110 (D.N.J. 2012) ("The case law does not suggest that a class member requesting exclusion from a settlement may nonetheless object to that settlement.") (citing *Mayfield v. Barr*, 985 F.2d 1090 (D.C. Cir. 1993)).

[82] ECF Doc. No. 34-4, at p. 4.

[83] *Id.*

[84] ECF Doc. No. 28-5, at p. 14 ("Plaintiff's Counsel will ask the Court for an award of attorneys' fees of up to 25% of the Settlement Amount ($1,300,000).").

[85] ECF Doc. No. 27.

[86] *In re High-Tech Employee Antitrust Litig.*, No. 11-02509, 2015 WL 5158730, at *15 (N.D. Cal. Sept. 2, 2015) ("[T]he Court overrules the objection . . . that the class had inadequate notice . . . because the motions for attorney's fees were not posted on the lawsuit's website, even though the motions were all publicly filed, in a timely manner, on the case's public electronic docket.").

[87] ECF Doc. No. 34-1, at p. 6.

[88] *Id.*

[89] *Id.*

[90] ECF Doc. No. 34-4.

[91] ECF Doc. No. 34-1, at p.5.

[92] ECF Doc. No. 25, at ¶ 27.

[93] ECF Doc. No. 34-4, at p.5.

[94] *See, e.g.*, *Kolinek*, 311 F.R.D. at 493 ($30); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d at 790 ($34.60); *Rose*, 2014 WL 4273358, at *10 ($20 to $40).

[95] *In re: Shop-Vac Mktg. & Sales Practices Litig.*, MDL No. 2380, 2016 WL 3015219, at *2 (M.D. Pa. May 26, 2016).

[96] ECF Doc. No. 25, ¶ 1.

[97] ECF Doc. No. 23-1, at ¶ 1.23.

[98] *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 337 (N.D. Ga. 1993) (concluding lack of injunctive relief "does not render the settlement unfair").

[99] ECF Doc. No. 34-1, at p. 3.

[100] ECF Doc. No. 23-1, at ¶ 2.4(a).

[101] *Id.* at p. 1.

[102] *Id.* at ¶ 1.23.

[103] *Id.* at ¶ 1.24.

[104] *See Lee v. Ocwen Loan Servicing, LLC*, No. 14-60649, 2015 WL 5449813, at *13 (S.D. Fla. Sept. 14, 2015).

[105] *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (quoting *Patterson v. Stovall*, 528 F.2d 108, 110 n.2 (7th Cir. 1976)).

[106] ECF Doc. No. 34-1, at p.3.

[107] *See In re Gen. Motors*, 55 F.3d at 792.

[108] ECF Doc. No. 34-4, at ¶ 13.

[109] *Id.*

[110] Fed. R. Civ. P. 23(h).

[111] *Prudential*, 148 F.3d at 333 (quoting *In re Gen. Motors*, 55 F.3d at 819); *see also In re Baby Products Antitrust Litigation*, 708 F.3d at 178–80; *McDonough v. Toys R Us, Inc.*, 80 F. Supp.3d 626, 649–50 (E.D. Pa. 2015).

[112] *O'Brien v. Brain Research Labs, LLC*, No. 12-204, 2012 WL 3242365, at *20 (D.N.J. Aug. 9, 2012) (quoting *In re Gen. Motors*, 55 F.3d at 820).

[113] *In re Am. Integrity Sec. Litig.*, No. 86-7133, 1989 WL 89316, at *4 (E.D. Pa. Aug. 8, 1989).

[114] *Loughner v. University of Pittsburgh*, 260 F.3d 173, 178 (3d Cir. 2001).

[115] *In re Cendant Corp.*, 243 F.3d 732 (quoting *Prudential*, 148 F.3d at 333).

[116] *Id.* (quoting *Prudential*, 148 F.3d at 333).

[117] *In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009).

[118] ECF Doc. No. 34-4, at ¶ 9.

[119] *Rose*, 2014 WL 4273358, at *5 (concluding a claims rate of about 3.3 percent "is in line with other settlements of this size," where the action involved seven million individuals but only 227,701 claimants).

[120] *McDonough*, 80 F. Supp. 3d at 651.

[121] *Id.* (citing *Prudential*, 148 F.3d at 339).

[122] *Lachance*, 965 F. Supp. at 648.

[123] *In re Intelligent Elecs., Inc. Sec. Litig.*, No. 92-1905, 1997 WL 786984, at *9 (E.D. Pa. Nov. 26, 1997).

[124] ECF Doc. No. 23-1, at ¶ 5.1.

[125] *Americana Art China Company, Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014).

[126] *Id.* at 247.

[127] *Id.*

[128] *Id.*

[129] *In re Cendant Corp.*, 243 F.3d at 732 (quoting *Prudential*, 148 F.3d at 333).

[130] *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 104 (E.D. Pa. 2013) (quoting *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 198 (3d Cir. 2000)).

[131] *In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000).

[132] We take judicial notice of the Act class action lawsuits where counsel were attorneys of record.

[133] *McDonough*, 80 F. Supp. 3d at 653.

[134] ECF Doc. No. 26-1, at p. 23.

[135] ECF Doc. No. 28, at ¶ 34.

[136] *Tavares v. S-L Distribution Co.*, No. 13-1313, 2016 WL 1743268, at *12 (M.D. Pa. May 2, 2016).

[137] *Esslinger v. HSBC Bank Nevada, N.A.*, No. 10-3213, 2012 WL 5866074, at *14 (E.D. Pa. Nov. 20, 2012).

[138] *Wallace v. Powell*, 301 F.R.D. 144, 167 (M.D. Pa. 2014).

[139] *In re Flonase Antitrust Litig.*, 291 F.R.D. at 105.

[140] *Gunter*, 223 F.3d at 199 (citing *Prudential*, 148 F.3d at 340–41).

[141] *In re AT & T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006).

[142] *Id.* (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005)).

[143] *In re Diet Drugs*, 582 F.3d at 545 n.42 (quoting *Prudential*, 148 F.3d at 341).

[144] ECF Doc. No. 28, at ¶ 29.

[145] *Id.* at ¶ 47.

[146] ECF Doc. No. 23-1, at ¶ 5.1.

[147] *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000) (quoting *In re Southern Ohio Correctional Facility*, 175 F.R.D. 270, 272 (S.D. Ohio 1997)).

[148] *Id.* (quoting *In re Southern Ohio Correctional Facility*, 175 F.R.D. at 272).

[149] *In re Imprelis Herbicide Mktg., Sales Practices & Prod. Liab. Litig.*, 296 F.R.D. 351, 371 (E.D. Pa. 2013) (quoting *Bredbenner v. Liberty Travel*, No. 09–905, 2011 WL 1344745, at *22 (D.N.J. Apr. 8, 2011)).

[150] *In re CertainTeed Corp. Roofing Shingle Prod. Liab. Litig.*, 269 F.R.D. 468, 486 (E.D. Pa. 2010).

[151] *Id.*

[152] *Chemi v. Champion Mortgage*, No. 05-1238, 2009 WL 1470429, at *13 (D.N.J. May 26, 2009).

[153] *See Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).

[154] *Id.* at 948–49, 976–77.

[155] *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947–48 (9th Cir. 2015).

[156] *Id.* at 947.

[157] *Id.* at 948.

[158] *Palmer v. Dynamic Recovery Sols., LLC*, No. 15-59, 2016 WL 2348704, at *10 (M.D. Fla. May 4, 2016).

[159] ECF Doc. No. 28-3, at ¶ 3.

[160] ECF Doc. No. 35-1, at p. 6.

[161] *Id.* at p. 7.

[162] *See Stoops v. Wells Fargo Bank, N.A.*, No. 15-83, 2016 WL 3566266, at *9 (W.D. Pa. June 24, 2016).

[163] *Id.* at *11.

[164] ECF Doc. No. 1, at ¶ 22.